## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sing O.,                                          Case No. 23-cv-3864 (ECW)

        Plaintiff,

   v.                                              **ORDER**

Leland Dudek,[1]
*Acting Commissioner of Social Security*,

        Defendant.

This matter is before the Court on Plaintiff Sing O.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 8) and Defendant's SSA Brief in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 11).[2]  Plaintiff filed this case seeking judicial review of a final decision by Defendant denying his application for disability insurance benefits.

## I.      BACKGROUND

On July 30, 2021, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act alleging disability as of May 17, 2017, due to a number of physical impairments, including, but not limited to, left eye blindness,

---

[1]      Leland Dudek is now the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 25(d).

[2]      As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

shoulder pain/numbness, and neck, right forearm, and hand pain.  (R. 177, 221).[3]  His

application was denied initially and on reconsideration.  (R. 67-85.)  Plaintiff filed a

written request for a hearing, and on October 5, 2022, Plaintiff appeared with the

assistance of an attorney and interpreter and testified at a hearing before Administrative

Law Judge William Reamon ("the ALJ").  (R. 29, 35-66.)

The ALJ issued an unfavorable decision on November 29, 2022, finding that

Plaintiff was not disabled.  (R. 17-29.)

Following the five-step sequential evaluation process under 20 C.F.R.

§ 404.1520(a),[4] the ALJ first determined at step one that Plaintiff had not engaged in

substantial gainful activity during the period from the alleged onset date of May 17, 2017.

(R. 20.)

At step two, the ALJ determined that Plaintiff had the following severe

impairments: cervical spine C5-C6 foraminal stenosis; bilateral shoulder tendinosis;

---

[3]    The Social Security Administrative Record ("R.") is available at Docket Entry 7.

[4]    The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the
> claimant is presently engaged in a substantial gainful activity; (2) whether
> the claimant has a severe impairment that significantly limits the claimant's
> physical or mental ability to perform basic work activities; (3) whether the
> claimant has an impairment that meets or equals a presumptively disabling
> impairment listed in the regulations; (4) whether the claimant has the residual
> functional capacity to perform his or her past relevant work; and (5) if the
> claimant cannot perform the past work, the burden shifts to the
> Commissioner to prove that there are other jobs in the national economy that
> the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

bilateral carpal tunnel syndrome; diabetes mellitus with neuropathy and right eye retinopathy and macular edema; left eye vision loss; and hypertension.  (R. 20.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 20-21.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) except: lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours and standing and/or walking for 6 hours out of an 8-hour workday; pushing and pulling as much as can lift and carry; frequent climbing of ramps or stairs; occasional climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling, crouching and crawling; frequent handling and fingering bilaterally; no work requiring excellent binocular vision; no work coming from left side (as in assembly line); no commercial driving; avoid concentrated exposure to extremes of cold and vibration; avoid close proximity to dangerous moving machinery and unprotected heights; no exposure to slippery walking surfaces.

(R. 22.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that Plaintiff was capable of performing past relevant work as a Companion (DOT No. 309.677-010, Light/Semi-skilled, SVP-3).  (R. 29.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 29.)

Plaintiff requested review of the decision and the Appeals Council denied further review on October 24, 2023, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-11.)  Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.

## II.     RELEVANT RECORD

### A.     Medical Record

On April 18, 2017, Plaintiff was seen regarding his complaints of neck pain. (R. 316.) Plaintiff had been previously seen in 2012 following an injury sustained at work and had been placed on restrictions of medium work with additional limitations regarding bending and twisting of the cervical spine, prohibiting repetitive lifting and overhead activity, and imposing a weight maximum of 20 to 25 pounds. (R. 316.) Plaintiff noted an increase of symptoms over the previous four months, with constant pain in his neck that radiated bilaterally to his upper extremities, and constant pain in the left extremity (describing it as electrical pain and numbness). (R. 316.) Plaintiff's left index finger and thumb bothered him the most, causing him to drop items, and he reported experiencing a decrease in grip strength. (R. 316.)

Plaintiff denied any change in his vision. (R. 316.)

Plaintiff's examination showed a nonantalgic gait; palpation of the spinous processes of the cervical spine did not elicit pain or tenderness; palpation of the paraspinal regions and soft tissues of the cervical spine did elicit some tenderness, and his cervical spine range of motion was mildly decreased in all planes secondary to pain. (R. 317.) Neurologically, muscle strength was slightly decreased with grip strength bilaterally, otherwise, muscle strength was 5/5 and equal to all areas of upper extremities tested. (R. 317.) Sensation to light touch was decreased in a global type of pattern to the

4

entirety of the left upper extremity.  (R. 317.)  Sensation to light touch was fully intact to

all areas of right extremity and biceps reflexes were 2/4 and equal.  (R. 317.)  Spurling's

test[5] was positive, left side worse than the right.  (R. 317.)  On examination of Plaintiff's

wrists, Phalen's compression test did significantly increase numbness and tingling into

the left hand, primarily into the long, index, and thumb; Tinel's[6] elicited shooting pain,

numbness, and tingling into the long, index, and thumb of the left hand; but no significant

thenar atrophy was noted.  (R. 317.)

Three MRI views of the cervical spine were obtained and reviewed.  (R. 317, 327-

28.)  Plaintiff's cervical spine demonstrated good alignment with no obvious listhesis

noted; there was a slight decrease in cervical lordosis; and disk space was decreased most

significantly at C5-C6.  (R. 317.)  Osteophyte formation was noted to the vertical body at

C5, otherwise no acute abnormities were noted.  (R. 317-18.)

The assessment for Plaintiff was cervical spine pain with bilateral upper extremity

radiculopathy, left worse than right; and an already known disk herniation at C5-C6 and

C6-C7 with associated foraminal stenosis bilaterally, which had been previously noted on

an MRI from November 2011.  (R. 318.)  Based on Plaintiff's symptoms in his hands, it

---

[5]     The Spurling test is performed in the assessment of a patient with symptoms of cervical radiculopathy to help determine the patient's pathology (and whether further imaging studies are indicated) and a positive Spurling Test helps to determine if the suspected diagnosis is a cervical nerve root compression commonly related to intervertebral disc pathology.  *See* https://www.ncbi.nlm.nih.gov/books/NBK493152/ (last visited Feb. 20, 2025).

[6]     Phalen's compression test and Tinel's test are both assessments for carpal tunnel syndrome.  *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC5027153/ (last visited Feb. 20, 2025).

was noted that further testing was needed to see if Plaintiff was suffering from carpal tunnel syndrome.  (R. 318.)  Plaintiff was given the following work restrictions: a weight maximum of 15 pounds for lifting; no overhead work; limited bending and twisting of the cervical spine; and he was not to engage in any prolonged bending of the neck.  (R. 318.)

On May 25, 2017, Plaintiff was seen by Joel Shobe, MD at St. Cloud Orthopedic Associates, Ltd. for a follow-up related to a work-place injury.  (R. 314.)  Plaintiff had known disk herniations in his cervical spine and had difficulty working.  (R. 314.)  His hands bothered him more than his arms or neck.  (R. 314.)  In the past, it has been mostly right-sided but more recently it had progressed to left-sided hand numbness and tingling, as well with primary complaints in the thumb and index fingers of both hands.  (R. 314.)  Plaintiff claimed it was hard for him to grip items.  (R. 314.)  On the left, he stated that it felt like the pain radiated down the left arm from the neck.  (R. 314.)  Plaintiff asserted that he had been off work for the previous two weeks because he felt uncomfortable working with his restrictions.  (R. 314.)  Upon examination, Plaintiff had positive Tinel's of the median nerve at the wrist bilaterally; had a positive median nerve compression test bilaterally causing numbness and tingling in the index and thumb bilaterally; his biceps and triceps strength appeared to be intact, 5/5 bilaterally; extension and lateral bending of the neck to the left caused left shoulder pain; lateral bending and extension to the right did not cause as much pain; he had pain with cervical extension; no pain with cervical flexion; wrist extension was 5/5; splayed fingers was 5/5; and grip strength was 5/5 but caused pain in his hands.  (R. 314.)  An MRI of the cervical spine from the same day showed he had bilateral foraminal stenosis noted at C5-C6, and moderate spinal stenosis

to the right at C6-C7 with a small disk herniation.  (R. 314.)  Dr. Shobe noted that this

MRI appeared unchanged from a previous MRI study in 2011.  (R. 314.)  The assessment

for Plaintiff was right-sided cervical disc herniation with spinal stenosis; bilateral C5-C6

foraminal stenosis, slightly worse on the left than on the right; and bilateral hand pain

with findings consistent with carpal tunnel syndrome.  (R. 314.)  Plaintiff was fit with D-

ring splints to wear at night to help with potential carpal tunnel syndrome and work

restrictions were provided that included no prolonged bending of the neck; maximum

lifting, pushing and pulling of 15 pounds; no overhead work; and no repetitive gripping

or grasping with either hand.  (R. 315.)  Plaintiff was cleared to return to work as of May

20, 2017.  (R. 315.)

On July 19, 2017, Plaintiff was seen by Dr. Shobe regarding his neck and bilateral

arm symptoms.  (R. 312.)  Plaintiff continued to complain of struggling with left sided

neck pain extending to the left scapular region and down the left arm into all the digits of

his left hand, with some elements of numbness down in the right hand primarily in the

ring and small fingers.  (R. 312.)  Plaintiff underwent EMG testing on June 30, 2017, that

suggested evidence for median nerve neuropathy bilaterally, consistent with carpal tunnel

syndrome, with no evidence for ulnar nerve entrapment seen.  (R. 312, 603-04.)  Dr.

Shobe believed that Plaintiff's symptoms of shooting pain in the left arm and neck were

the result of carpal tunnel syndrome, involving numbness; a disk herniation on the right

at C6-C7; and the bilateral foraminal stenosis noted at C5-C6 on his prior MRI scan on

May 24, 2017.  (R. 312.)  It was noted that he had previously tried therapy for his neck

and cervical steroid injections that provided relief only for a day or so.  (R. 312.)

Plaintiff was advised that he could benefit from surgical intervention neck at the C5-C6 and C6-C7 levels, but Dr. Shobe could not guarantee that it would provide complete improvement in the numbness in his hand. (R. 312.) A work note was provided increasing his lifting to 25 pounds, but otherwise to continue avoiding overhead reaching and repetitive bending of his neck. (R. 313.)

On August 20, 2017, Plaintiff was seen for a consultation related to bilateral hand pain, numbness, and tingling. (R. 310.) Plaintiff complained that he had been experiencing issues with both of his hands, bothering him with use and at night. (R. 310.) Numbness and tingling had become a somewhat persistent issue for him, radiating from his shoulder to his hand. (R. 310.) During his examination, it was noted that Plaintiff had no apparent difficulties with visualizing or hearing. (R. 310.) Evaluation of his bilateral upper extremities revealed positive Phalen's compression and Tinel's at the wrist. (R. 310.) Plaintiff claimed mild persistent numbness and tingling; altered sensation to light touch; and he appeared to have some issues with his neck with radicular symptoms radiating down his arms as well. (R. 310.) Plaintiff underwent EMG testing that showed findings consistent with bilateral carpal tunnel syndrome. (R. 311, 321-22.) Andrew Staiger, MD recommended a left carpal tunnel release to correct this issue, with the same for the right side if relief was realized for the left hand. (R. 311.)

On November 13, 2017, Plaintiff was seen for a "recheck" on his neck, bilateral arm pain, and hand pain symptoms. (R. 308.) It was noted that Plaintiff had seen Dr. Staiger who believed that some of Plaintiff's arm and hand symptoms were consistent with carpal tunnel syndrome bilaterally and proposed proceeding with left carpal tunnel

release, which Plaintiff decided not to proceed with at that time.  (R. 308.)  Plaintiff

complained of considerable neck pain extending into the left scapular region down the

left upper arm and forearm with pain and numbness into all the digits of his left hand.  (R.

308.)  He also claimed some numbness and tingling in the right hand and wrist only, but

this was something he could tolerate.  (R. 308.)  He had no radicular pain down the right

arm.  (R. 308.)  Plaintiff also represented that he refused to undergo neck surgery based

on a friend or relative's experience where surgery did not solve their symptoms.  (R.

308.)  On examination, Plaintiff had good strength in all muscle groups of the upper

extremities and moved about the room quite freely.  (R. 308.)  Plaintiff's May 24, 2017

MRI accounted for his symptoms, showing bilateral foraminal stenosis at the C5-6 level,

with a bit more foraminal narrowing on the left than the right; and disc herniation was

seen centrally and to the right at the C6-7 level causing more narrowing of that foramen.

(R. 308-09.)  Dr. Shobe advised surgical intervention for his cervical spine condition,

which Plaintiff hoped to avoid due to what he described as his friend's experience.  (R.

309.)  Plaintiff did represent that he would consider proceeding with the carpal tunnel

release on the left hand.  (R. 309.)  Dr. Shobe's restrictions for Plaintiff included no

lifting over 20 to 25 pounds, no prolonged or repetitive overhead work, and limited

repetitive motions with his hands.  (R. 309.)

On May 11, 2018, Plaintiff represented that he used "to work at Electrolux but has

not been working for the past year **due to hurting his foot on the job**, he is on medical

leave/disability."  (R. 593 (emphasis added).)

9

On January 25, 2018, Plaintiff had a preoperative appointment regarding his carpel tunnel syndrome, however, the provider was confused, as they and St. Cloud Orthopedic were unaware of the surgery date.  (R. 600.)  Plaintiff was able to move all extremities well, with no weakness or joint problems.  (R. 600.)  Plaintiff showed full range of motion.  (R. 601.)

On January 31, 2019, Anthony Bottini, MD conducted an Independent Medical Evaluation of Plaintiff, including a review of Plaintiff's medical record and an examination of Plaintiff.  (R. 367.)  Plaintiff complained of cervical pain with range of motion, as well as left periscapular pain also related to range of motion; intermittent paresthesias and pain down his left upper extremity, primarily in the left C6 dermatomal pattern; and of bilateral hand numbness mostly in a median nerve distribution with the left side again more affected than the right.  (R. 380.)

As part of the physical examination of Plaintiff, Dr. Bottini noted that:

Cervical range of motion demonstrates 50 degrees of flexion and 5 degrees to 10 degrees of extension. He has a positive Spurling's sign toward the left upper extremity with both rotation and cervical extension. His primary sensory complaint is decreased light touch with accompanying paresthesias in a median nerve distribution bilaterally with the left side more affected than the right. He has a very positive Phalen's sign at the wrists bilaterally, and positive Tinel's signs of both his left carpal tunnel and the left medial epicondyle of his elbow. Tinel's sign is negative on the right side. Motor examination of his bilateral upper extremities shows 5/5 strength with the exception of his left biceps which is 4/5. This examination is repeated with a consistent result. Intrinsic hand musculature including flexor carpi ulnaris and abductor digiti quinti shows 5/5 strength bilaterally. There is no evidence of atrophy of his hand intrinsic musculature. Deep tendon reflex testing is 1+ and equal throughout his bilateral upper extremities with the exception of his right triceps reflex which is absent.

> Examination of [Plaintiff's] lumbar spine shows good active range of motion to 90 degrees of flexion and 10 degrees of extension without significant complaint of back or leg pain. Motor examination of his bilateral lower extremities shows a 5/5 strength including plantar and dorsiflexion at the ankles or weightbearing. Straight leg raising sign is negative bilaterally. Gait is normal and [Plaintiff] is capable of tandem gait and stance. Sensory examination of his lower extremities is normal to light touch. He is able to mount and dismount the examination table without difficulty, without assistance, and without pain behavior.

(R. 378-79.)  The diagnosis for Plaintiff was multilevel cervical degenerative disc disease with bilateral cervical radiculopathy, left greater than right, involving C6 and C7 nerve roots.  (R. 380.)  According to Dr. Bottini, there was no evidence of cervical myelopathy.  (R. 380.)  There was clinical and electrophysiologic evidence of median neuropathy at the wrists.  (R. 380.)  Dr. Bottini also opined that Plaintiff suffered partial permanent disability rating of 21% for the purposes of Minnesota Workers compensation benefits with regard to his cervical radicular condition as of June 19, 2009.  (R. 382.)

On March 12, 2019, Plaintiff was seen regarding his vision.  (R. 576.)  Plaintiff asserted that his vision fluctuated some with his blood sugars, but that he had started a new medication to get better control.  (R. 577.)  He had not worn glasses in the past, with his last eye exam occurring five years earlier.  (R. 577.)  He claimed that he had not been able to see out of his left eye since he was a child.  (R. 577.)  His vision was 20/50 -1 for the right eye and was only able to count fingers at a distance of three feet.  (R. 578.)  The diagnosis for Plaintiff was Type 2 diabetes mellitus with both eyes affected by moderate nonproliferative retinopathy and macular edema.  (R. 576.)

On March 14, 2019, Plaintiff was seen by Polly Qulram, MD for blurred vision that was presumed to be Diabetic Macular Edema.  (R. 422.)  The onset of this occurred

while he was reading, and he claimed it was a little bothersome.  (R. 422.)  It was noted that he was suffering from diabetes with ocular complications for over ten years.  (R. 422.)  Plaintiff's vision was Dsc20/70 -l. PHNI for the right eye and Dsc2'/200 for the left eye.  (R. 422.)  The finding from Plaintiff's examination was retinal thickening consistent with macular edema.  (R. 423.)  The impression for Plaintiff was diabetic Macular Edema, severe nonproliferative diabetic retinopathy, cataracts that had minimal impact on vision, and amblyopia.  (R. 423-24.)  Options for treatment included focal laser photocoagulation, Lucentis (a prescription anti-vascular endothelial growth factor injectable drug), steroid injections, or a combination thereof.  (R. 423.)   Plaintiff chose to proceed with the Lucentis injections, but did not have a driver so he deferred treatment with a plan to return in 2-3 weeks.  (R. 421, 424.)

The August 30, 2019 examination for Plaintiff showed a normal range of motion, including in his neck.  (R. 564.)

On December 19, 2019, Plaintiff was again seen for his blurred vision involving diabetic macular edema, which was stable.  (R. 407.)  Plaintiff's vision was rated at 20/20 for his right eye and 5/200 for his left eye.  (R. 407.)  The examination showed no change as to macular edema, but there was a new vitreous hemorrhage that would be treated with Lucentis, and that while it caused some blocked vision, it would cause no damage.  (R. 408-09.)

On February 4, 2020, the examination for Plaintiff showed normal range of motion, including in his neck.  (R. 553.)

On April 9, 2020, Plaintiff was seen for a follow-up for his eye conditions. (R. 401-02.) Plaintiff eyesight was 20/20 -1 for the right eye and 4/200 for the left eye. (R. 401.) The examination for macular edema showed improvement. (R. 402.) Lucentis injections were given, and he was told to increase his use of artificial tears. (R. 402.)

On April 22, 2020, Plaintiff claimed that his vision had worsened in his right eye. (R. 398.) Plaintiff's eyesight was 20/20 -1 for the right eye and 5/200 for the left eye. (R. 398.) The examination for macular edema showed improvement. (R. 399.) Plaintiff was treated for Diabetic Macular Edema OD with Lucentis injections. (R. 399.)

On July 17, 2020, Plaintiff was diagnosed with proliferative diabetic retinopathy in both eyes, with traction retinal detachments not involving maculae, associated with type 2 diabetes mellitus. (R. 539.) Plaintiff was blind in the left eye. (R. 539.) His vision was 20/30 for the right eye and he was only able to count fingers at one foot away with his left eye. (R. 541.) Plaintiff also suffered from age related cataracts and astigmatism for both eyes for which he was provided with prescription lenses. (R. 539.) Plaintiff complained of blurred vision that was stable, but still blurry for reading. (R. 539.)

On August 13, 2020, seen for a follow-up regarding his diabetes, Type II with ocular complications. (R. 394.) There was worsening from the previous study upon examination with increased edema. (R. 394-95.) Plaintiff's eyesight was 20/25 -2 for the right eye and 5/200 for the left eye. (R. 394.) The impression for Plaintiff was diabetic macular edema with Lucentis injections started, proliferative diabetic retinopathy,

vitreous hemorrhage that was gradually clearing, minimal cataracts that had no impact in Plaintiff's vision, and amblyopia.  (R. 395-96.)

On August 22, 2020, Plaintiff was seen for a follow-up of his diabetes, Type II with ocular complications involving decreased blurry vision that showed improvement. (R. 411.)  There was no change in edema thickening noted as to one eye and noted improvement as to the other eye.  (R. 412.)

On October 8, 2020, Plaintiff was again seen for a follow-up regarding his diabetes, Type II with ocular complications involving decreased blurry vision.  (R. 390.) Plaintiff's eyesight was 20/25 +2 for the right eye and 4/200 for the left eye.  (R. 390.) The impression for Plaintiff was improvement of diabetic macular edema with Lucentis injections, proliferative diabetic retinopathy, vitreous hemorrhage that was gradually clearing, and cataracts that had a minimal in Plaintiff's vision.  (R. 391-92.)

On November 2, 2020, Plaintiff was again seen for his diabetes, and it was noted that his diabetic complications included moderate nonproliferative diabetic retinopathy with macular edema and diabetic neuropathy (complaints of numbness in both hands). (R. 529.)  Plaintiff denied loss of vision, muscle weakness, and numbness.  (R. 531.)

On December 3, 2020, Plaintiff was seen for a follow-up regarding his diabetes, Type II with ocular complications involving blurred vision.  (R. 386.)  Plaintiff's eyesight was 20/30 +2 PNHI for the right eye and 3/200 for the left eye.  (R. 386.)  There was no significant change from the previous study upon examination.  (R. 387.)  The impression for Plaintiff was stable diabetic macular edema with Lucentis injections, proliferative

diabetic retinopathy, vitreous hemorrhage that was gradually clearing, and minimal cataracts that had no impact in Plaintiff's vision.  (R. 387.)

On March 8, 2021, Plaintiff was seen for his diabetes and it was noted he had no joint pains, neck or back pain, and no muscle weakness or numbness.  (R. 519.)

On March 16, 2021, Plaintiff reported bilateral shoulder pain, which he had suffered from for years with no diagnosis, but said he was not taking any over-the-counter medication to deal with the pain.  (R. 515.)  The exam for Plaintiff's neck was normal, there was shoulder tenderness, his range of motion for his shoulders was normal, and his grip strength was mildly decreased in his left hand.  (R. 516.)

On April 21, 2021, Plaintiff was seen at Interventional Pain & Physical Medicine Clinic for a primary concern of shoulder pain with secondary cervical pain.  (R. 464.) Plaintiff had complained of cervical pain for the last 11 years with 80% of the pain located in the neck and 20% of the pain located in his shoulders.  (R. 464.)  It was noted that Plaintiff had a history of carpal tunnel syndrome, tendinosis of the bilateral shoulder joints with bursitis, and a possible inferior labral tear of the right shoulder joint.  (R. 464.) His examination showed evidence of bilateral shoulder joint pain and neck pain, and he sought treatment for his shoulder joints.  (R. 464.)  The MRI scan of his cervical spine showed evidence of severe left and moderate right neural foraminal stenosis at the C5-C6 level and there was mild-to-moderate central canal stenosis at the C6-C7 level with severe bilateral neural foraminal stenosis.  (R. 467, 468-69.)  Plaintiff received steroid injection into both of his shoulders, and it was noted that he could benefit from an

injection related to the stenosis of the cervical spine.  (R. 467.)  Imaging of his shoulders showed no tear of rotator cuff and trace to mild signs of tendonitis.  (R. 470-73.)

On May 5, 2021, Plaintiff was seen for a follow-up of his shoulder pain and reported 80% improvement from an April 26, 2021 bilateral shoulder intra-articular joint injection.  (R. 455-56, 461.)  Plaintiff also underwent a steroid injection at the C7-T1 level.  (R. 458-59.)

On May 19 and 25, 2021, Plaintiff was seen for a follow-up to his shoulder pain. (R. 446, 452.)  Plaintiff reported an improvement in pain and functioning (including range of motion) so much so that he was no longer taking Tylenol or ibuprofen.  (R. 446-47, 452.)  Plaintiff had received a cervical epidural steroid injection at C7-T1 on May 5. (R. 447, 453.)

During a June 8, 2021 appointment related to his diabetes, Plaintiff represented that he had no joint pains, arthritis, neck or back pain, myalgias or stiffness, and denied the loss of vision.  (R. 510.)  Plaintiff was diagnosed with mild nonproliferative diabetic retinopathy and macular edema, associated with type 2 diabetes mellitus.  (R. 510.)

On June 9, 2021, Plaintiff was seen for his shoulder pain, which he complained constituted all of his pain.  (R. 443.)  He had received a cervical medial branch block on May 26, 2021, at bilateral C5-6, C6-7, and C7-T1, and reported a 90% improvement in his pain and function level.  (R. 444, 449.)

On June 14, 2021, Plaintiff was seen for physical therapy related to his shoulder pain.  (R. 437.)  Plaintiff reported that his pain had improved.  (R. 437.)  Plaintiff had received a cervical medial branch block at bilateral C5-6, C6-7, and C7-T1.  (R. 437,

440.)  Plaintiff showed moderate apprehension during the examination of his neck.  (R. 438.)  Active flexion was 70 degrees; active extension was 30 degrees; active right rotation was 35 degrees and caused 70% mild pain in his middle cervical spine; and active left rotation was 35 degrees and caused 70% mild pain in his middle cervical spine. (R. 438.)  Physical therapy was the treatment plan.  (R. 439.)

On July 13, 2021, Plaintiff was seen for his cervical pain.  (R. 434.)  Plaintiff had complained of cervical pain for the last 11 years with 80% in the neck and 20% of the pan located in his shoulders.  (R. 434.)  His symptoms included joint pain, stiffness, numbness, and muscle spasms.  (R. 434.)  Plaintiff was not working but was able to complete activities of daily living and walk without adaptive equipment.  (R. 435.)  The goal for Plaintiff was to achieve a full range of motion of cervical spine with only mild pain or less in 4 to 6 weeks, have increased cervical rotation to be able to safely look over his shoulder while driving in 6 weeks, and return to work with pain of no more than 3/10 in 6 weeks through physical therapy and home exercises.  (R. 436.)

On August 18, 2021, Plaintiff was diagnosed with proliferative diabetic retinopathy in both eyes with traction retinal detachments not involving maculae, associated with type 2 diabetes mellitus.  (R. 502, 676, 723.)  Plaintiff was blind in the left eye.  (R. 502.)  Plaintiff's vision was rated at 20/30 in the right eye, and he was only able to count fingers at three feet away using his left eye.  (R. 505.)  Laser treatment and injections were recommended but Plaintiff could not afford the medicine or copays at that time.  (R. 502.).  Plaintiff also had age-related cataracts and astigmatism of both eyes, for which he was given a new prescription and lenses.  (R. 502.)  Plaintiff complained of

17

blurred vision. (R. 502.) Plaintiff represented "Distance vision OD mildly blurry, has glasses to wear when driving." (R. 503.)

During a September 8, 2021 appointment related to his diabetes, Plaintiff represented that he had no joint pains, arthritis, neck or back pain, myalgias or stiffness, and he denied the loss of vision. (R. 497.) Plaintiff was diagnosed with mild nonproliferative diabetic retinopathy with macular edema, associated with type 2 diabetes mellitus. (R. 499.)

On September 30, 2021, Plaintiff was diagnosed with proliferative diabetic retinopathy in both eyes with traction retinal detachments not involving maculae, associated with type 2 diabetes mellitus. (R. 489, 670, 717.) Laser treatment and injections were recommended but refused by Plaintiff due to the inability to pay for his medicine and insurance copays. (R. 489.) Plaintiff's eyesight was stable with no changes from the previous visit. (R. 489.) Plaintiff's vision was rated at 20/50 in the right eye and was only able to count fingers at one foot away. (R. 492.)

On October 29, 2021, Plaintiff was seen for an eye exam related to his diabetes. (R. 665-66, 712.) Plaintiff's vision was rated at 20/70 in the right eye using glasses (cc) and he was only able to count fingers at three feet away using his left eye. (R. 668.)

During a January 3, 2022 eye exam, Plaintiff's vision was rated at 20/60 in the right eye and he was only able to count fingers at three feet away using his left eye. (R. 651.)

On February 7, 2022, Plaintiff was diagnosed with proliferative diabetic retinopathy in both eyes with traction retinal detachments not involving maculae,

associated with type 2 diabetes mellitus.  (R. 643, 702.)  Plaintiff was blind in the left

eye.  (R. 643.)  Plaintiff's vision was rated at 20/70 in the right eye and he was only able

to count fingers at three feet away using his left eye.  (R. 646.)  Laser treatment and

injections were recommended but refused by Plaintiff due to the inability to pay for

medicine and the insurance copays.  (R. 643.)  Plaintiff's vision was stable from the last

visit.  (R. 644.)

On or about March 31, 2022, Plaintiff underwent a consultative orthopedic and

musculoskeletal examination.  (R. 617.)  Plaintiff presented with a history

musculoskeletal pain and numbness of the extremities, with symptoms in the feet that he

asserted affected his walking.  (R. 617.)  The symptoms in his lower back affected his

standing and he was using a cane to ambulate.  (R. 617.)  Plaintiff's examinations showed

he was not in acute distress; he was blind in the left eye; his vision in right eye was

normal; and his range of motion testing of the right and left shoulder, elbows, wrists,

cervical spine, thoracic spine, and lumbar spine all showed no restriction or instability.

(R. 617-22.)  Hand sensory was decreased (in a glove and stocking), and his upper

extremity strength was just under 4 out of 5.  (R. 623.)  The assessment for Plaintiff was

carpal tunnel syndrome; pain in left knee; type 2 diabetes w diabetic autonomic

(poly)neuropathy; and blindness, left eye, normal vision right eye.  (R. 624.)  The RFC

assigned to Plaintiff was:

> **Lifting:** Will be able to lift 10 lbs. frequently above the shoulder. Can carry
> up to 20 pounds frequently**.**
> **Walking**: In an 8-hour workday may walk 2-4 hours.
> **Standing**: In an 8-hour day can stand for up to 2 hours.
> **Sitting**: In an 8-hour day can sit for up to 6-8 hours.

**Bend**: Can bend occasionally.
**Squat**: Will be able to squat.
**Ability to work at Height**s: Will not be able to work at Heights or climb ladder.
**Operate foot**: Cannot use the feet for repetitive movement such as operating foot controls.
**Hand controls**: Can use two hands for repetitive activities include a single grasping, pushing, and pulling and fine manipulation. He is able to use a cane.

(R. 624.)

On April 8, 2022, state agency doctor Gregory Salmi, MD opined based on the available record that Plaintiff suffered from severe musculoskeletal disorders and found the following RFC for Plaintiff: Unlimited as it relates to pushing and pulling involving the upper extremities and limited as to the lower extremities; unlimited ability to balance; could frequently climb stairs, stoop, kneel, crouch, and crawl; occasionally climb ladders; unlimited ability to reach in the front, reach overhead, and feel; and limited ability as to gross and fine manipulation involving the hands and fingers. (R. 71-72.) His vision was limited as to all categories as to his left eye; he was to avoid concentrated exposure to extreme cold vibrations, and hazards; and he had no limitations with respect to dealing with extreme hot, wetness, humidity, noise, and fumes/odors. (R. 71-72.) With respect to gross and fine manipulation involving the hands and fingers, Plaintiff was limited to frequent, not repetitive activities. (R. 72, 81.) On reconsideration, state agency doctor Paul Ossmann, MD found that this RFC remained appropriate, despite Plaintiff's complaints of increased right shoulder pain. (R. 79-82.) Dr. Ossmann did include the additional severe impairment of carpel tunnel syndrome. (R. 79.)

On May 9, 2022, Plaintiff was diagnosed with proliferative diabetic retinopathy in both eyes with traction retinal detachments not involving maculae, associated with type 2 diabetes mellitus. (R. 630, 697.) Plaintiff was blind in the left eye. (R. 630.) Plaintiff's vision was rated at 20/70 -1 in the right eye and he was only able to count fingers at three feet away using his left eye. (R. 633.) Laser treatment and injections were recommended but refused by Plaintiff due to the inability to pay insurance copays. (R. 630.) Plaintiff complained of blurred nearsighted vision that fluctuated with blood sugars. (R. 630.) Plaintiff asserted that his near and far vision had worsened from the previous visit. (R 630-31.)

On May 24, 2022, Plaintiff had another follow-up related to his diabetes. (R. 738.) It was noted that Plaintiff's diabetic complications included mild nonproliferative diabetic retinopathy with macular edema. (R. 738, 742.) Plaintiff noted no joint, back or neck pain and the examination of his joints and gait were normal. (R. 740-41.) Plaintiff also denied vision loss. (R. 740.)

On August 9, 2022, Plaintiff was again seen for his eyes and complained that his vision was blurred and fluctuated with his blood sugars. (R. 692.) Plaintiff asserted that his vision had worsened from his previous visit and that he had lost his glasses. (R. 692-93.) Plaintiff's vision was rated at 20/400 in the right eye and he was only able to count fingers at one foot away using his left eye. (R. 695.)

On August 24, 2022, Plaintiff had a follow-up related to his diabetes. (R. 730.) It was noted that Plaintiff's diabetic complications included moderate nonproliferative diabetic retinopathy with edema. (R. 730.) Plaintiff noted no joint, back, or neck pain,

and examination of his joints and gait was normal.  (R. 733.)  Plaintiff also denied vision loss.  (R. 733.)

On September 29, 2022, Plaintiff was again seen for a follow-up regarding his eyes.  (R. 748.)  Examination of the macula showed increased thickening consistent with macular edema and hemorrhaging.  (R. 748.)  The fundus had also worsened due to retinal hemorrhaging.  (R. 748.)  The primary impression for Plaintiff was diabetic macular edema and proliferative diabetic retinopathy.  (R. 748.)  Secondary concerns were vitreous hemorrhage, nuclear sclerosis that was diabetes related, and amblyopia.  (R. 748.)  Plaintiff was treated with Lucentis injections for the edema.  (R. 749.)  It was noted that Plaintiff could need laser treatment for his retinopathy if it remained active.  (R. 749.)  Plaintiff's eyesight was "Dsc20/100 [ ] PNHI" for the right eye and he could see hand motions using the left eye.  (R. 748.)

**B.    Testimony before the ALJ**

Plaintiff testified during the hearing using an interpreter.  (R. 37.)  He testified that he did not attend school when he was a child in Laos and Thailand, before he came to the United States at the age of 18 or 19.  (R. 42-44.)  He further testified that while he briefly attended school in the United States, he was not able to understand anything because he was "too old."  (R. 44.)  Plaintiff testified that while he had to speak and read in English to pass the U.S. citizenship test, he "did not understand much."  (R. 44.)

Plaintiff testified during the hearing before the ALJ that he could not work because the vision in his left eye was blurry and that the vision in his right eye was starting to get blurry.  (R. 52.)  His vision was fine when looking at something close to

him, however, if the object was far away, he was unable to see the same object.  (R. 53-54.)  Plaintiff did state that he watched television daily, although sometimes it became blurry, and claimed he needed to sit close to the television.  (R. 52, 54.)  Plaintiff also testified that he did some cleaning and also cooked noodles for his son.  (R. 53.)  According to Plaintiff, he experienced weakness in the right hand and left-hand numbness, making it difficult to hold onto a spoon and fork.  (R. 55.)  Plaintiff was able to get dressed, but needed help getting a jacket on by himself.  (R. 56.)  He also asserted that he could not cut his own fingernails because he lacked the strength to do so.  (R. 57.)  Plaintiff admitted that surgery was available to address the issues with his hands, but that he was afraid to undergo the procedure.  (R. 55.)  Similarly, he acknowledged that his doctors had recommended surgery on his neck and but he refused to undergo the procedure because he had a relative that had become paralyzed due to surgery.  (R. 55.)

### III.    LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error in law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018).  As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.  Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence . . . is more than a mere scintilla.  It means—

and means only—such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision
as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (cleaned up). "If
substantial evidence supports the Commissioner's conclusions, this court does not reverse
even if it would reach a different conclusion, or merely because substantial evidence also
supports the contrary outcome." *Id.* "In other words, if it is possible to reach two
inconsistent positions from the evidence, and one of those positions is that of the [ALJ],
the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL
5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838
(8th Cir. 1992)).

In reviewing the record for substantial evidence, the Court may not substitute its
own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380
F.3d 441, 445 (8th Cir. 2004). Assessing and resolving credibility is a matter properly
within the purview of the ALJ. *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016)
(citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003)) ("Our touchstone is that
[a claimant's] credibility is primarily a matter for the ALJ to decide.").

## IV.    DISCUSSION

Plaintiff raises three issues to the Court: (1) the ALJ erred at step three by failing
not considering listing 2.04 related to his visual acuity; (2) the ALJ erred in his
assessment of Plaintiff's RFC as to his cervical impairments and carpal tunnel syndrome

by determining that he could frequently finger, handle, and feel; and (3) the ALJ erred with respect to finding that Plaintiff could perform his past work and whether he performed this work at a substantial gainful activity level.  (Dkt. 9.)  The Court will address these arguments in turn.

## A.    Listing 2.04

As noted above, Plaintiff first argues that the ALJ erroneously failed to consider Listing 2.04 related to his visual acuity.  (Dkt. 9 at 4.)  The Commissioner's regulations provide that certain impairments are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a).  Such conditions are described in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1.  Plaintiff has the burden of proof to establish that his impairment meets or equals a listing.  *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990)).  A claimant must point to specific evidence to establish that she meets each requirement of the listing.  *See Sullivan*, 493 U.S. at 530.  "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing.  'An impairment that manifests only some of the listing criteria, no matter how severely, does not qualify.'"  *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (cleaned up) (quoting *Sullivan*, 493 U.S. at 530).

With respect to Plaintiff's vision, the ALJ made the following findings as to the listings:

The claimant's visual impairments do not meet listings 2.02 or 2.03. He retains 20/100 vision in the right good eye based on recent ophthalmology examination in late September 2022. (See Exhibit 16F/3). While he did have visual acuity of 20/400 in the same eye based on examination on August 9, 2022, the undersigned does not find this test result supported in view of two prior tests rating the claimant's visual acuity at 20/70 in May and February 2022. (See Exhibit 14F/9, 14). The undersigned also finds the 20/400 result from August 2022 to be widely inconsistent with the more recent 20/100 findings and no explanation was provided by the ophthalmologist for the precipitous decline in the claimant's vision between May 2022 and only three months later in August 2022. Accordingly, the undersigned finds that the claimant's visual impairments do not meet either listing 2.02 or 2.03.

(R. 21-22.)

As a starting point, "[a]lthough it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion." *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003) (citing *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001)). Listing 2.04, relied upon by Plaintiff, involves "[l]oss of visual efficiency, or visual impairment, in the better eye[,]" and requires:

A. A visual efficiency percentage of 20 or less after best correction (see 2.00A7d); OR

B. A visual impairment value of 1.00 or greater after best correction (see 2.00A8d).

20 C.F.R. § 404, Subpt. P, App. 1, § 2.04. Visual efficiency percentage is calculated by multiplying visual acuity efficiency percentage by visual field efficiency percentage and diving by 100. *Id.* § 2.00A7d. A visual impairment value is calculated by calculated by adding visual acuity impairment value and visual field impairment value. *Id.* § 2.00A8d.

Plaintiff takes the position that while the ALJ found that his vision had improved to 20/100 in September 2022 from 20/0400 in August 2022, the ALJ did not consider the abbreviations "Dsc20/100. PHNI." (Dkt. 9 at 5.) Plaintiff maintains "Dsc" is defined as "distant chart with correctors," which he asserts "may mean that this is the best Sing O.'s vision can be from a distance" and that "PHNI" means pinhole no improvement. (*Id.* at 5 (citation omitted).) Plaintiff noted that while it is not clear what the notations say to a lay person, it is not just a clear, concise 20/100, which is supported by the finding by Dr. Quiram of increased edema and hemorrhaging and that his vision had decreased. (*Id.*) Plaintiff also takes issue with the ALJ's complaint that no explanation was provided by the Dr. Quiram for the precipitous drop in vision, noting that the ALJ does not make medical decisions, and offering his own hypothesis that the drop in vision could have been caused by fluctuating blood sugars. (*Id.* at 5-6.) Defendant counters that to the extent that Plaintiff now asserts that the 20/400 acuity from August 2022 satisfies Listing 2.04, he fails to explain how a single examination finding satisfied any of the listing criteria and the duration requirement. (Dkt. 11 at 9.) Defendant also challenges Plaintiff's claim that visual acuity document intends the abbreviation "Dsc" to refer to "distant chart with correctors," arguing that the abbreviation "sc" indicates the vision was measured "without correctors," while "cc" indicates "with correctors." (*Id.* (citation omitted).)

During the period between March 2019 through May 9, 2022, the vision for Plaintiff's right eye was measured during multiple medical appointments and fluctuated between 20/20 to 20/70. (*See*, *e.g.*, R. 386, 390, 394, 398, 401, 407, 422, 492, 541, 578,

614, 633, 646, 651, 668, 679.)  During a March 31, 2022 consultative examination, it was noted Plaintiff had normal eyesight in his right eye.  (R. 619.)  It was not until August 2, 2022, that Plaintiff had vision was rated at 20/400 in the right eye, and by September 29, 2022, Plaintiff's eyesight was "Dsc20/100 [ ] PNHI" for the right eye.  (R. 695, 748.)

Plaintiff's reliance on the single 20/400 rating is misplaced.  Under the regulations, to satisfy the listings, Plaintiff must show that the impairment meeting the listing must last or can be expected to last for a year:

> For some listings, we state a specific period of time for which your impairment(s) will meet the listing. For all others, the evidence must show that your impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months.

20 C.F.R. § 404.1525(c)(4).  In other words, the criteria for the Listing 2.04, which provides no specific time period, must be satisfied or can be expected to be satisfied over a continuous period of 12 months.  *See Casillas v. Astrue*, No. 3:09-CV-00076, 2011 WL 450426, at *4 (W.D. Va. Feb. 3, 2011) ("If a listed impairment is not expected to result in death, and does not state a specific period of time for which your impairment(s) will meet the listing, then the evidence must show that the impairment 'has lasted or can be expected to last for a continuous period of at least 12 months.") (marks and citations omitted); *see also Butts v. Saul*, No. CV 20-00068-B, 2021 WL 1051119, at *13 (S.D. Ala. Mar. 19, 2021) (citation and marks mitted) ("The medical criteria must be met for a period of twelve continuous months."); *Page v. Astrue*, No. 1:12-CV-3367-WSD, 2014 WL 988825, at *12 (N.D. Ga. Mar. 12, 2014) (same); *Castro v. Astrue*, 2009 WL

1975513 *4 (M.D. Fla. July 8, 2009) (the criteria of Listing 1.04(A) cannot be satisfied "intermittently," but must be satisfied over a period of 12 months).

Plaintiff acknowledges the improvement of his eyesight from 20/400 on August 9, 2022 to 20/100 at the next visit on September 29, 2022. (Dkt. 9 at 4-5.) However, Plaintiff argues that the improvement is not real because the ALJ did not take into account the notations "Dsc20/100 [ ] PNHI." (*Id.* at 5.) The Court rejects this argument because Plaintiff incorrectly asserts that "sc" means that the measurement was taken with corrective lenses. (*See id.*) On the contrary, the refence relied upon by Plaintiff provides the "cc" refers to "with correction." *See* https://eyeguru.org/translator/ (last visited Feb. 20, 2025). Indeed, "sc" stands for a measurement without correction, while "cc" references with correction, which is also reflected by vision measurements taken by other providers. (R. 668; *see also* "Visual Acuity," https://www.ncbi.nlm.nih.gov/books/ NBK563298/ (last visited February 20, 2025).)

Similarly, Plaintiff's reliance on "PHNI" is of no avail. As noted by Plaintiff, PNHI stands for "pinhole no improvement." (Dkt. 9 at 5.) Plaintiff admits that the meaning of this notation is unclear, stating what whatever it means, "it is not just a clear, concise 20/100." (*Id.*) It is Plaintiff's burden to show that he met Listing 2.04, and a generalized, unexplained, and unsupported statement that the PHNI statement means his right eye vision was not a "clear, concise 20/100" does not satisfy that burden. *See Johnson*, 390 F.3d at 1070. Given the record, the substantial evidence supports that Plaintiff did not meet or equal Listing 2.04.

**B.    Plaintiff's RFC**

A disability claimant has the burden to establish his RFC.  *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "'based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  *Id.* (quoting *Myers*, 721 F.3d at 527).  Indeed, "'[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'"  *Perks*, 687 F.3d at 1092 (citations omitted) (quoting *Cox*, 495 F.3d at 619-20).

As set forth previously, the ALJ found that Plaintiff had the following RFC:

[T]o perform light work as defined in 20 CFR 404.1567(b) except: lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours and standing and/or walking for 6 hours out of an 8-hour workday; pushing and pulling as much as can lift and carry; frequent climbing of ramps or stairs; occasional climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling, crouching and crawling; frequent handling and fingering bilaterally; no work requiring excellent binocular vision; no work coming

from left side (as in assembly line); no commercial driving; avoid concentrated exposure to extremes of cold and vibration; avoid close proximity to dangerous moving machinery and unprotected heights; no exposure to slippery walking surfaces.

(R. 22.)

Plaintiff argues that the medical evidence supports that his cervical impairments had deteriorated significantly and that the ALJ did not take this into account in determining the RFC. (Dkt. 9 at 8-9.) In addition, Plaintiff challenges the RFC limiting him to frequent handling and fingering bilaterally when the medical records show that he has significant neuropathy in his hands, and he testified that he is unable to do some normal cares for himself. (*Id.* at 9.) Defendant argues that the ALJ gave proper weight to Plaintiff's cervical limitations in view of the treatment Plaintiff received, his refusal to follow recommended treatment, including surgery for cervical foraminal stenosis allegedly due to a friend's negative experience, and his otherwise conservative treatment. (Dkt. 11 at 11-14.) Similarly, Defendant points to the recommended bilateral carpal tunnel release, which was put on hold in early 2018 after a diabetes mellitus diagnosis during a preoperative visit, where Plaintiff never underwent the procedure due to fear of paralysis based on his friend's experience and because his son was too young. (*Id.* at 11-12.) According to Defendant, the overall record supported the ALJ's findings that the impairments did not warrant additional limitations for Plaintiff. (*Id.* at 14-15.) This Court addresses the parties' arguments regarding Plaintiff's cervical impairments and his ability to use his hands and fingers in turn.

### 1.     Cervical Impairments

Plaintiff argues that the ALJ did not consider his deteriorating cervical condition in formulating the RFC.  (Dkt. 9 at 9.)  But the record shows the opposite, namely that the ALJ considered the medical record and Plaintiff's subjective complaints with respect to his cervical condition.  (*See* R. 23-29.)  It is important to emphasize that "'[t]he mere presence of a medical condition is not per se disabling.  The claimant must also show that the condition causes functional limitations.'"  *Shilitha C. v. O'Malley*, No. 23-CV-600 (ECW), 2024 WL 626444, at *8 (D. Minn. Feb. 14, 2024) (quoting *Martin v. Astrue*, No. 09-cv-1998 (RHK/JJG), 2010 WL 2787437, at *6 (D. Minn. June 7, 2010), citing *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990)).

There is no dispute that the medical record contains assertions by Plaintiff that his cervical region was causing him pain.  (*See*, *e.g.*, R. 308, 434).  However, as discussed by the ALJ, the medical evidence does not support additional limitations.  In April of 2017, Plaintiff complained of increased cervical pain, but palpitation of the soft tissues around the cervical spine only showed some tenderness and his range of motion was only mildly decreased due his pain.  (R. 317.)  An MRI taken of his cervical spine did show lateral foraminal stenosis noted at C5-C6, and moderate spinal stenosis to the right at C6-C7 with a small disk herniation, but this study showed the same results as the MRI taken in 2011, well prior to the date of claimed disability in 2017, and was largely unchanged in an April 2021 MRI.  (R. 314, 467, 468-69.)   When Plaintiff was advised that he could benefit from surgical intervention neck at the C5-C6 and C6-C7 levels, Plaintiff repeatedly stated that he was not interested in pursuing surgery, including at the hearing

before the ALJ. (*See*, *e.g.,* R. 55, 309, 312.) The August 2019 and February 2020 examinations of Plaintiff showed that he had normal range of motion in his neck. (R. 553, 564.) On March 8, 2021, Plaintiff claimed that he had no joint pains, neck or back pain, and while he later claimed bilateral shoulder pain on March 16, 2021 (but was not taking any medication for the pain), the examination for Plaintiff's neck was normal and the range of motion for his shoulders was also normal. (R. 515, 516, 519.) In April of 2021, Plaintiff complained of shoulder and neck pain, received steroid injections in his shoulder (noting 80% relief) and underwent a steroid injection in his cervical spine on May 5. (R. 455-56, 458-59, 464, 467.) By the end of May, Plaintiff reported that he was doing so well that he stopped taking over-the-counter pain medications. (R. 446-47, 452.) On June 8, 2021, Plaintiff represented that he had no joint pains, arthritis, neck or back pain, myalgias, or stiffness. (R. 510.) The next day, Plaintiff claimed that a cervical branch block had improved all of the pain in his shoulders and his function level by 90%. (R. 443-44.) During a September 8, 2021 appointment, Plaintiff represented that he had no joint pains, arthritis, neck or back pain, myalgias or stiffness. (R. 497.) In March 2022, testing of his range of motion of the right and left shoulder, elbows, wrists, cervical spine, thoracic spine, and lumbar spine all showed no restriction or instability. (R. 619-22.) On May 24, 2022, Plaintiff noted no joint, back or neck pain and the examination of his joints and gait were normal. (R. 740-41.)

Given this record, Plaintiff's conservative treatment, and the refusal by Plaintiff to undergo treatment to alleviate his claimed cervical deterioration, the Court finds that the ALJ's decision with respect to the RFC and Plaintiff's cervical impairments is supported

by substantial evidence. *See Buford v. Colvin*, 824 F.3d 793, 797 (8th Cir. 2016) ("[T]he conservative treatment, management with medication, and lack of required surgical intervention all support the ALJ's RFC determination.") (citation omitted); *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.") (citations and marks omitted).

### 2.    Use of Hands and Fingers

Plaintiff challenges the RFC limiting him to frequent handling and fingering bilaterally when the records show that he has severe carpal tunnel syndrome causing significant neuropathy in his hands, and he testified that he is unable to do some normal cares for himself. (Dkt. 9 at 9.) According to Plaintiff, this information should have confirmed to the ALJ that Plaintiff was limited to at most occasional handling and fingering. (*Id.*) Defendant argues, similar to his cervical condition, Plaintiff's conservative treatment and refusal to undergo surgery to alleviate his carpal tunnel cuts against Plaintiff's subjective complaints and that this coupled with the consistent state agency opinions provides substantial evidence to support the RFC limitation. (Dkt. 11 at 14-15.)

As noted by the ALJ (R. 24-28), the medical record supports that Plaintiff was suffering from bilateral carpal tunnel syndrome, with complaints of numbness and a recommendation that he proceed with a carpel tunnel release. (*See, e.g.*, R. 308, 311, 321-22, 379.) That said, even while hand sensory was decreased, Dr. Bottini noted Plaintiff's examination of his bilateral upper extremities showed 5/5 strength (except for

the left bicep as 4/5) and Dr. Robert Larbi-Odam opined that Plaintiff could use both hands for repetitive activities, including a single grasping, pushing, and pulling and fine manipulation, despite observing decreased hand sensation in Plaintiff's hands.  (R. 624.) The state agency doctors found Plaintiff had unlimited "[f]eeling (skin receptors)" and limited fingering and handling, specifically frequent non-repetitive handling and fingering in both upper extremities secondary to his bilateral carpel tunnel syndrome.  (R. 72, 81, 379, 623, 624.)

The Court is cognizant of Plaintiff's testimony that sometimes he drops his utensils when he eats and that he cannot cut his own fingernails (R. 55, 57), however, these assertions and the overall purportedly debilitating effect on his function is undermined by the limited treatment related to this condition, including his continued refusal through October 2022 to undergo a carpel tunnel release, which was first recommended in 2018 (R. 27, 55).  *See Brown*, 390 F.3d at 540 ("Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.").  For all of these reasons, substantial evidence supports the Commissioner's conclusions with respect to handling and fingering, even though substantial evidence may support a contrary outcome.  *See Nash*, 907 F.3d at 1089.

## C.    Past Relevant Work

Plaintiff argues that at step four of the sequential analysis, the ALJ "cajoled" the VE to change Plaintiff's past job description as a personal care assistant ("PCA") to that

of "companion," a job with lesser lifting requirements. The relevant exchange between

the ALJ and the VE was as follows:

> Q I did want to mention that in the work history form that I saw in the file, I think it's at 5E, when the question was asked on that form about what the maximum lifting was on the PCA job and he put an X in the 20-pound box. Where it says weight frequently lifted, he X'd the less than ten-pound box. He did indicate that walking was done four hours a day on that job and standing was done four hours a day. With what I just mentioned to you about the description of the PCA job, would that have any impact on the rating that you assigned to the job as a medium job?
>
> A It would, Your Honor. The job is a medium job[7] by definition would be also [sic] for lifting up person that fell over and there's no way around that. If the job wasn't a personal care attendant job and it didn't require lifting a person, it would be called a companion job. A companion does not have to lift a person up.
>
> Q Okay, so, that's the distinction then is having to lift a person?
>
> A Being physically responsible for another body, yes.
>
> Q Okay. If it's a companion job rather than a PCA job, is that a different DOT?
>
> A It is and a companion essentially does shopping for a person, may help them cook, but there would be no actual nursing type activities performed. No responsibilities for wellbeing or welfare in general.

(R. 61-62.)

After the hearing, the VE opined that the last hypothetical person provided by the

ALJ at the hearing could perform work as a companion, DOT 309.677-010. (R. 301.)

The companion work is classified as light and involves:

---

[7]     Medium work is defined as requiring "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

> Cares for elderly, handicapped, or convalescent persons: Attends to employer's personal needs [PERSONAL ATTENDANT (domestic ser.)]. Transacts social or business affairs [SOCIAL SECRETARY (clerical)]. Reads aloud, plays cards, or other games to entertain employer. Accompanies employer on trips and outings. May prepare and serve meals to employer.

309.677-010 Companion, DICOT 309.677-010; *see also* R. 301.

The Court begins with Plaintiff's challenge to the ALJ's decision to finding him not disabled based on his description of his past work as being a Companion rather than a PCA. (Dkt. 9 at 10.) At step four in the analysis, it is not about a "blind matching of job titles," but whether "the claimant's job duties are consistent with the job duties described in the DOT, such that the ALJ can rely on the DOT to determine whether the claimant can perform her past work as generally performed in the national economy." *Wilson v. Comm'r, Soc. Sec. Admin.*, No. 3:15-CV-00691-HZ, 2016 WL 1598867, at *11 (D. Or. Apr. 20, 2016); *Otto v. Comm'r Soc. Sec. Admin.*, No. 3:14-CV-01028-MA, 2015 WL 4066684, at *8 (D. Or. July 2, 2015) (examining whether the job duties listed for a DOT code, whose job title did not match plaintiff's job title, were sufficiently similar to the type of work the plaintiff performed at past job to support the ALJ's step four findings); *see also Owens v. Colvin*, 727 F.3d 850, 851 (8th Cir. 2013) ("The Dictionary of Occupational Titles, a resource for determining the duties of a claimant's past relevant work.") (citation omitted). Ultimately, Plaintiff has the burden to prove at step four that he cannot perform his past relevant work. *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008).

Plaintiff reported that his job involved lifting and carrying groceries from the store to the car to the house, carrying laundry, and taking his client (his father) to medical

appointments.  (R. 230, 232.)  There is no mention of Plaintiff lifting a person in the description of his work nor did he testify that he needed to lift anyone at the hearing before the ALJ.  Moreover, Plaintiff also represented in his work history that he frequently lifted less than 10 pounds, and the maximum he lifted was 20 pounds in his report regarding his work prior work, which is less than what is required by a PCA.  (R. 230.)  Plaintiff asserts that just because his father, who he cared for, was mobile does not mean that the job did not require lifting (although he makes no mention about lifting a person).  (Dkt. 9 at 10.)  Given the absence of any evidence that Plaintiff's past work in caring for his father included lifting his father, the Court finds the ALJ's decision to characterize his past work based on Plaintiff's duties in that role, rather than the job description in the work history or Plaintiff's testimony describing his job, is supported by substantial evidence.

Plaintiff makes the additional argument that he did not do the job of a companion at the substantial gainful activity level.  (Dkt. 9 at 10.)  "To qualify as past relevant work at step four of the sequential analysis, the claimant's past work must be 'substantial gainful activity.  This means work activity that involves doing significant physical or mental activities,' even on a part-time basis, and is 'done for pay or profit.'"  *Sloan v. Saul*, 933 F.3d 946, 951 (8th Cir. 2019) (marks and citations omitted); *see also* 20 C.F.R. § 404.1572(b).  In addition, "[t]o be relevant, past work must have been done within the last 15 years, lasted long enough for the person to learn to do it, and constituted 'substantial gainful activity.'"  *Reeder v. Apfel*, 214 F.3d 984, 989 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1565(a)).  Earnings above a specified amount results in a

presumption that the applicant has engaged in substantial gainful activity. *See* 20 C.F.R.

§ 404.1574(b)(2).

> The ALJ found as follows:

> Earnings from 2007 through 2020 establish the presumption of substantial gainful activity. (See Exhibits 5D-7D; 9D; 10D; 12D). As this work was semi-skilled and SVP-3, it required one to three months of work to learn the skills and duties of the work, which the claimant's work experience easily satisfies. (See Exhibits 4E; 5E). Therefore, it is found that the claimant's past work as Companion satisfied all three requirements of the regulations to establish past relevant work: it was performed within the past 15 years, at a rate of income sufficient to establish substantial gainful activity, and for a period of time sufficient to establish the 'duration' requirement.

(R. 29.)

Plaintiff argues that ALJ erred in his determination with respect to establishing substantial gainful activity, as his companion work was only part-time and because he did not earn over the substantial gainful activity amount since his onset date of his disability. (Dkt. 9 at 10.) However, as the pertinent regulations point out, substantial gainful activity includes part-time work that is determined over the past 15 years and not just the 2017 onset of disability. *See* 20 C.F.R. § 404.1572(b); 20 C.F.R. § 404.1574(b)(2). As noted by the Commissioner, Plaintiff met the required monthly substantial gainful activity levels within 15 years of the ALJ's decision:

| Year | Total Earnings | Monthly Average Earnings | Monthly SGA level[2] |
|------|---------------|-------------------------|-------------------|
| 2008 | $12,752 | $1,062 | $940 |
| 2009 | $13,104 | $1,092 | $980 |
| 2010 | $15,750 | $1,312 | $1,000 |
| 2012 | $20,470 | $1,705 | $1,010 |
| 2015 | $16,161 | $1,346 | $1,090 |
| 2016 | $15,651 | $1,304 | $1,130 |

(Dkt. 11 at 18 (footnote omitted); *see also* R. 187-89, 193-95; POMS, ID 10501.015, *Tables of SGA Earnings Guidelines and Effective Dates Based on Year of Work Activity*, https://secure.ssa.gov/apps10/poms.nsf/lnx/0410501015 (last visited Feb. 20, 2025).)

Finally, Plaintiff argues that while the ALJ found that he could do his past work, he is illiterate and the Selected Characteristics of Occupations ("SCO") for the companion position has a level 3 "Language Development" requiring the ability to read a variety of novels, magazines, atlases and encyclopedias and to write reports. (Dkt. 9 at 13.) This appears to be a reference to the Dictionary of Occupational Titles ("DOT") 309.677-010 COMPANION, which provides in relevant part:

> Cares for elderly, handicapped, or convalescent persons: Attends to employer's personal needs [PERSONAL ATTENDANT (domestic ser.)]. Transacts social or business affairs [SOCIAL SECRETARY (clerical)]. **Reads aloud, plays cards, or other games to entertain employer.** Accompanies employer on trips and outings. May prepare and serve meals to employer.
>
> * * *
>
> Language: Level 3 - READING: Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and

maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.

WRITING: Write reports and essays with proper format, puncuation [sic], spelling, and grammar, using all parts of speech.

SPEAKING: Speak before an audience with poise, voice control, and confidence, using correct English and a well-modulated voice.

DOT 309.677-010 COMPANION.

Plaintiff bears the burden to show that he cannot perform his past relevant work. *See Sloan v. Saul*, 933 F.3d 946, 950 (8th Cir. 2019). Plaintiff's reliance on his illiteracy is based on his own representations in his application for benefits. (Dkt. 9 at 13 (citing R. 220, 222).) Defendant does not address this argument and acknowledges that Plaintiff testified with the assistance of an interpreter at the hearing. (Dkt. 11 at 3.) The ALJ made no findings with respect to Plaintiff's literacy and the VE did not give an opinion on Plaintiff's ability to satisfy the Language requirements set forth in the DOT.

A claimant is not disabled if he retains the RFC to perform "the actual functional demands and job duties of a particular past relevant job" or "the functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61 at *2 (Jan. 1, 1982); *see also Lowe v. Apfel*, 226 F.3d 969, 973 (8th Cir. 2000) (citing *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996)) ("Where the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled.") The DOT can be relied upon for the later. SSR 82-61 at *2. These two tests of past relevant work in SSR 82-61 are "meant to be disjunctive," where "[i]f the

claimant is found to satisfy either test, then a finding of not disabled is appropriate."
*Martin v. Sullivan*, 901 F.2d 650, 653 (8th Cir. 1990); *see also Wilson v. Colvin*, No. 12-
CV-2828 (LIB), 2014 WL 12573548, at *9 (D. Minn. Mar. 24, 2014). The ALJ
acknowledges this distinction. (R. 19.)

Here, there is no dispute that Plaintiff was able to perform his past work as a PCA
for his father through "Minnesota National Health Kare Corp" notwithstanding his
literacy or illiteracy. That said, the VE and the ALJ only addressed whether Plaintiff
could perform the Companion position as "generally performed" based on the DOT (R.
29, 301), and did not resolve the possible apparent conflict with respect to the DOT and
its language requirements. *See Courtney v. Comm'r, Soc. Sec. Admin.*, 894 F.3d 1000,
1003 (8th Cir. 2018). As such, the present case should be remanded to the Commissioner
to make findings regarding Plaintiff's literacy and language fluency as it relates to the
DOT and its language requirements for the Companion position, obtain further testimony
from a vocational expert as to whether Plaintiff can perform his past work, and to
continue the sequential analysis if necessary. The Court orders remand to the agency for
further proceedings as to this issue, but finds the remainder of the ALJ's decision is
supported by substantial evidence.

## V.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS
HEREBY ORDERED** that:

1.    Plaintiff's Motion for Summary Judgment (Dkt. 8) is **GRANTED IN
PART**.

2.      Defendant's request that the Court affirm the decision (Dkt. 11) is

**DENIED**.

3.      The hearing scheduled for March 24, 2025 is **CANCELLED**.

4.      This case is **REMANDED** to the Commissioner pursuant to sentence four

of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Order.

        **LET JUDGMENT BE ENTERED ACCORDINGLY**


DATED: February 21, 2025                    _s/Elizabeth Cowan Wright_
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge